Thank you, Your Honor. May it please the Court, Timothy Coates on behalf of the appellant. I have had the benefit of an opening and reply brief, so I won't repeat everything that's in there, but I will hit the highlights. This is a tragic case, no question about it. We're not disputing the significant verdict on negligence of $3.6 million, but it's our view that it is not a constitutional violation. At the very least, the individual defendants are entitled to qualified immunity, and that there is no valid basis for civil rights liability against the city. I'll turn first to the qualified immunity argument. Of course, it has two components. It has the merits components, was there enough evidence to show that it was excessive force? The second being, was the law clearly established? They kind of tie together here, because part of what plaintiff's pitch was in the district court was that a carotid artery hold is itself, per se, deadly force. That was their whole pitch, was that you shouldn't be using this against someone who wasn't presenting an immediate physical threat. We can debate about the extent of the threat posed. I think the video shows continued active resistance, but that was the pitch they made. I think it's a pitch that cannot be supported by this court's case law, and we cite the Gregory versus City of Maui case. It's a similar case in terms of officers responding to an individual who was acting irrationally, isn't really posing a deadly threat to anyone. I think he had a pen in his hand and was acting odd, and the court found that, among various types of use of force, that an attempt to apply the carotid artery hold was not excessive force. And so I don't think we can say that using it is, per se, deadly force. If we look at the Graham factors here, however unfortunate the result, this wasn't a case of someone who is passively resisting. I think it's difficult to say that a fight that lasts five minutes, where two officers are attempting to wrestle this gentleman, bring him into compliance. He, at one point, after plaintiffs have said he's been choked unconscious several times, breaks away from the officers. They taser him, both dart and stun mode. They hit him with batons. They go out in the parking lot. They're still all fighting. He manages to run across the street through traffic, finally trips, and they bring him into compliance. And unfortunately- Mr. Coach, let me stop you there just for a second, because you said that this was a fight. And certainly he resisted. I don't deny that. But I didn't see him swing at the cops or kick the cops. It just seemed to be, it was kind of, he didn't comply with what they wanted, so they were gonna take him down. Why couldn't the jury see that that's what happened in this case? Well, he's not allowed to wrestle the cops. Wrestling is active resistance. You know, officers are- No, I agree- Of course, yeah, and I take the court's point. In terms of fighting, there is actual fighting in the parking lot. I mean, he kicks the officers, he strikes one of them. There's no question about that. I don't think the plaintiffs are debating that blows were exchanged in the parking lot. But I do think there's a continuous course of resistance and that he's wrestling and pushing the officers around. That's how he eventually breaks away. And again, the taser application's ineffective to stop him from leaving the laundromat. Well, this is a- Go ahead, no, go ahead, Judge Lee. But this is, we're reviewing after a jury verdict. I mean, can't we, should we give some deference to the jury saying that it's excessive force given that he wasn't armed, he wasn't suspected of a serious crime, and then the hold was longer than what the policy allowed? I know there's some dispute of what the policy allows, but I mean, shouldn't we give some deference to say, look, there was substantial evidence for the jury's finding that there was excessive force here? Well, there are a couple of things. One, on the significance of the offense. They try to bring him in custody initially for a minor offense, but then he does physically and actively resist. And I think that's what causes the prolonged struggle is that he doesn't just give up. So I think we're allowed under Graham to look at that factor. Second, under Scott versus Harris, of course, if the court has video evidence, it can look at it and say, is this sufficient to support the verdict? Because if he does, and look, appear to be actively resisting throughout, then I think, yes, absolutely, a court can say, we take this away from a jury just the way the court took it away from a jury by affirming or granting summary judgment in the Scott versus Harris case based upon the video. So I think the court can certainly do that. I will turn to the second part of qualified immunity, because I think this is where it's very difficult, I think, for the plaintiffs to try and overcome here. And that is to point to a case that under Kissela controls these facts, a case directly on point. They can't do that. They don't attempt to do that. The closest they come is the Tuolumalo case, which is actually after the events. I think it's a 2019 case. And it's a carotid artery hold on somebody who is fully compliant, someone who is handcuffed. So there's no active resistance there. That was the whole point in that case. They also cite Drummond, but Drummond is also not a carotid artery hold. And it's also a case where an individual said, I was fully handcuffed and fully compliant. And I think that is not even remotely similar to what we have here. And in fact, this case is a lot closer to Gregory in terms of the officer's perception as to the level of force that they could attempt to apply here. And so I think the qualified immunity analysis ends with the fact that they cannot point to a carotid artery hold case that is similar. We have one that is. They have not shown that the law was clearly established so that the officers would know that an attempt to use this hold was wrong in every single circumstance, which is what the Supreme Court has said the standard is. And they've tried to- But counsel, we have a lot of cases involving maybe not this technical particular hold, but we have a lot of cases that say if you're putting weight on somebody and you're restricting breathing, the cops can be liable there. It seems to me that you're asking us to really put a fine point on this, that those cases we ignore because they don't apply to this particular hold. Is that right? Well, I will tell you, I mean, I think under Casella, that is absolutely true. I mean, I don't think that that language is not terribly broad in Casella, essentially a case that is on point and specific facts. And the Supreme Court has particularly said in the context of Fourth Amendment, you really do need very, very specific facts. But again, the other fact that's critical here, the case they cite, the notion is the person is handcuffed and fully compliant. And I just don't think you can look at this video and say there was ever compliance by Mr. Valenzuela. You just don't see it. And that's why I think you absolutely do have to point to a case where officers are in the midst of this kind of struggle and a person passes away. They haven't tried to do that. And I think under Casella, it's a very tight standard. That's what they have to do. And particularly again, we have case law. We have Gregory versus County of Maui that tells you that you can use this level of force in this type of circumstance. So I don't think general positional asphyxia cases help in the context of this case. I don't think that meets the Casella standard, which I think is a very, very strict standard. I will turn next to the Monell claim, because I think this is another one where the plaintiffs really have a problem. Now the court found, the jury rejected the training claim, but they found a Monell violation. The court said, well, they found the policy was unconstitutional. And the district court determined the policy was unconstitutional because it allowed use of a carotid artery hold in circumstances where you could not use deadly force. And as we point out, that isn't the law. The law under Gregory versus County of Maui says you can use a carotid artery hold in circumstances similar to this. So the policy itself is not unconstitutional under the law of this circuit. And so plaintiffs try and fight a little bit of a rear guard action. They say, well, it's not that it was per se deadly force, but that this was passive resistance. And again, that's not what they argued at trial. It's not what the district court found. And this is not passive resistance. You look at the Emmons case and remand from the Supreme Court and just running by an officer was considered not to be passive resistance. And so I think wrestling with officers for several minutes can't be characterized as that. This simply is not a per se unconstitutional policy. So then you go, is it deliberately indifferent? And they can't show that either. You can't show any previous incidents in the city of Anaheim where use of this hold has produced a similar lawsuit or injuries of that type. That's the burden that they have to meet. Second, other jurisdictions have similar policies. So the city council wouldn't be on notice that it's per se unconstitutional to have this kind of policy. There's simply no basis for Manel liability. Well, let me ask you about that. It seems to me you're making an argument that there wasn't sufficient evidence for the jury to reach its verdict. Is it, are you, at its core, are you making a sufficiency argument here? Yeah, no, we argue as a matter of law that the district court upheld it saying the jury could find there was an unconstitutional policy because it allowed a crud order where you shouldn't be able to use deadly force. And our point is that's wrong as a matter of law. It's not deadly force, too. There's no other basis to defend it. There's no deliberate indifference. I will turn to the Bain Act claim briefly. It's also a fee-bearing claim. There's no evidence these officers acted with the intent to violate Mr. Valenzuela's civil rights. I think this is reflected in the jury's rejection of the 14th Amendment claim. Now, the district court trying to reconcile those, and I think as we argue pretty intensively in the brief, that doesn't withstand Porter v. Osborne because the judge said, well, as long as you intend to use some excessive force, you didn't intend to kill him, so no 14th Amendment claim. That doesn't survive Porter. That's not the standard. You can't intend to use excessive force and still act with a legitimate law enforcement purpose. So I think we're entitled to judgment as law on the Bain Act claim. I just don't think there's evidence of intent, but at the very least, a new trial. I'll turn briefly to herdanic damages before reserving time for rebuttal because I have a lot of assistance on hedonic damages. I have a colleague to argue it, and I've had amicus briefs. I'll just note that Robertson v. Wagman's standard isn't a maximum recovery standard. The default is that you apply state law, and you apply state law unless it defeats the purpose of Section 1983. And I think the Frontier Insurance v. Blatty case out of Sixth Circuit has a very good analysis of this issue in the context of hedonic damages in terms of you look and see the state law allows significant recovery for some significant damages. The answer is yes in California. We have a $3.6 million award based on this court's decision in Chaudhry. We have $6 million in pre-death pain and suffering on top of that. It's difficult to say that that is not a substantial recovery or does not meet the deterrent purposes of Section 1983, whereas hedonic damages, as Frontier Insurance notes, are not actually damages the decedent truly experiences, and it does not defeat the policy of Section 1983 where you otherwise have a significant recovery. And the district court said, well, there might be circumstances in which nobody has heirs and, you know, you kill them quickly, that sort of thing. But I think what Robertson tells us is you don't look what happens in a particular case. You look at what happens in the mine run of cases to determine does this contradict the policies of Section 1983. And I don't think we can say that given the significant awards that are available under California law as run through Section 1983. So you don't need hedonic damages to serve any of the purposes, and it's ultimately a windfall for the heirs. And since I'm getting down to my last two minutes, I will reserve the rest of my time for rebuttal. Very well. Thank you, Mr. Coates. Thank you, Your Honor. Mr. Hu. Thank you, Your Honor. Chris Hu from Orbitz & Levy for the Association of Southern California Defense Council. I'm going to try to reserve one minute for rebuttal and I'll watch the clock. Very good. So I'll be focusing on whether loss of life damages are available in Section 1983 actions. And this is an important issue of first impression in this circuit. And I agree with Mr. Coates' point that the controlling analysis here has to start with state law. And that's because Congress chose to adopt state tort remedies for civil rights actions. Under generally applicable California law, a decedent's estate cannot recover damages for loss of life. And this court can disregard state law only when, as Mr. Coates noted, it's inconsistent with federal law. And that's actually a very high bar. You have to look at whether the state law scheme, considered as a whole, fails to provide meaningful compensation and deterrence. There's simply no inconsistency here and there's no reason to disregard state law. So first, compensation. The remedies that are already available to plaintiffs in cases like this provide for meaningful recovery. The estate can recover economic damages, so things like lost wages or medical expenses. There may be cases where punitive damages are available. And the estate can recover attorney's fees, which are not normally available under state law. In addition, and this is really crucial, the decedent's family can assert a wrongful death claim. These types of claims allow family members to recover for economic and non-economic damages, including non-economic damages for loss of society and companionship. Now, plaintiffs have suggested there may be some outlier cases where wrongful death damages wouldn't be enough. But the reality is that in the vast majority of cases, or in many cases, wrongful death damages are a very significant category of recovery. And Valenzuela is a perfect example. As Mr. Coates mentioned, even if you set aside totally loss of life damages, plaintiffs here recovered about $10 million and that includes $3.6 million in wrongful death damages alone. Mr. Hu, let me jump in real quick because I anticipate Mr. Calippo's gonna say, we don't have a blank slate here. We've got Chaudhry. And there's a sentence in Chaudhry that says section 377.34, which is the same statute issued in this case, does not apply to section 1983 claims where the decedent's death was caused by a violation of federal law. How do we write around that sentence? So Chaudhry does not control the outcome here, Your Honor, and even plaintiffs admit that Chaudhry's holding is limited to pre-death pain and suffering damages, does not address loss of life damages. And when Chaudhry refers to section 377.34, what it's doing is it's modifying the last clause of that statute, which refers to, which says, quote, do not include damages for pain, suffering, or disfigurement. It's not modifying the rest of that generally applicable statute, which says that in all personal injury cases in California generally, in a survival action, the damages are limited to the loss of, quote, the loss or damage that the decedent sustained or incurred before death. Do not read Chaudhry as affecting in any way that part of the statute. And when the decision reports or reviews the Seventh Circuit's decision in Bell very highly and says Bell is a loss of life case and we should follow Bell, what's your response to that? Whoops, did we lose Mr. Hu? It would appear so, Your Honor. All right, we're gonna stand by for a second here. Ms. Manning, thank you for stopping the clock. You're always very, very good at doing that. Very impressive. He's coming back. Mr. Hu, don't worry, we stopped the clock. Okay, I'm very, I apologize, Your Honor. Look, it's not the first time and it won't be the last time this happens during one of these things. So the question was, before we start the clock, the question was again, the Ninth Circuit in Chaudhry speaks kind of approvingly of Bell in the Seventh Circuit, which was a loss of life case. And so what's your response to that? And we can start the clock. So when Chaudhry spoke approvingly of Bell, it was not talking about Bell's holding on loss of life damages. It considered Bell along with two other cases from other circuits. And I believe a fair reading of Chaudhry is that when it's agreeing with Bell, it's agreeing with Bell's general holding that there may be situations where a particular mix of remedies under state law is insufficient. And under the facts of Bell, it held that Wisconsin's disallow of loss of life damages was inconsistent. But nothing in Chaudhry can be fairly read to say that it's expressing approval of that similar bar under California law, because California has a different mix of remedies that's available. For example, the state statute in Bell didn't even allow punitive damages, which are available under California law. In addition, Chaudhry did not address the availability of wrongful death damages under California law. And I see I have only about 13 seconds. So unless the panel has further questions, I'll end there. Well, what we'll do, we'll give you that minute. And Mr. Gallipo, don't worry, you're gonna have really the time you wanna have to argue the case. All right, so we'll turn to Mr. Gallipo. Let's go ahead, Ms. Manning, let's go and put 20 on there. One, two. One more, there we go. All right, Mr. Gallipo, it's your turn. Okay, thank you very much. And good morning to all of you. And thank you for the extra time. I feel like I have a lot to say and I'll try not to talk too fast. With respect to Judge Lee's comment, I think he's absolutely correct that given that this is a verdict post, this is a decision post jury verdict, the court has to give deference to the verdict and to all of the facts. In fact, as the court is aware in judging qualified immunity, you have to assume all the facts in plaintiff's favor and take all reasonable inferences from those facts. And the appellants in this case did not do that at the district court level, and that's arguably waivered. But beyond that, if you do do that, particularly with the last restraint in the parking lot of the 7-Eleven, after two air chokes had already been applied by June, multiple tasers, a kick to the face, four baton strikes, and he fell down in the parking lot of the 7-Eleven after saying multiple times, I can't breathe earlier, after literally running for his life, pleading for help 12 times and running across the street and falling down in the parking lot, unarmed, no serious crime at all. And Wolf puts him in an air choke and Gonzales shows up. And this is very important from our perspective. Because at this point, Wolf is thinking, great, let's handcuff him now. We've got three officers, it's over. But at that time, his Sergeant Gonzales tells him to hold the choke as he has his arm across the front of Mr. Valenzuela's neck, as Mr. Valenzuela is wheezing, turning purple, eyes bulging, tongue sticking out in obvious respiratory distress. And they have that arm around the neck for at least 60 to 90 seconds, maybe upwards to two minutes. And even more importantly, at some point after Wolf gets on top of them, holding this hold at Gonzales' direction, he stops moving. And they still have the hold on him for almost a minute. And even more importantly, based on the record, he makes a snoring sound 35 seconds before the hold is released. And the medical evidence at trial was that snoring sound was agonal breathing, which was nearly a, he was dying at that point, not moving. And they kept that restraint for 35 seconds after that. And when you, Judge Owen, said, well, can't the court consider a lot of other cases, such as Drummond and others, regarding inability to breathe and asphyxiation? I would say the answer is absolutely yes. And at that point, I think a favorable view of the evidence is he was no threat, not resisting, restrained. And all of that force was clearly excessive in violation of their own training as found by the district court. Now, assuming those facts, let's talk about the clearly established prong of qualified immunity. There are cases, several cases that we cited. Let's start with Tamala Mallard. Counsel incorrectly states that Tamala Mallard was handcuffed. That's incorrect. A careful reading of that case, and I watched the argument yesterday out of curiosity, he was not handcuffed. And it was a single carotid restraint for about 12 seconds. But what's most important in that case, that case held the decision written by Judge Fletcher, that in January, 2014, the law was clearly established that even a single carotid restraint against a non-resisting suspect was excessive. And that, and they cited the Bernard case, a 2013 case, where the decedent was not handcuffed either, or the plaintiff, he had one handcuff on. Other cases would be Drummond, Slater, which I know Judge Owens, you were a part of, that cited Drummond, which is similar fact pattern. So there's an abundance of cases, and their case, quite frankly, Gregory, is of no help to them. It's so clearly distinguishable from this case, and probably the most important distinction at the outset, when you read Gregory, there's no choke hold at all. The court says, in the opinion, the evidence was there was no choke hold. They never once mentioned carotid restraint, air choke, or choke hold. To the contrary, they say there was no choke hold. And the facts of Gregory, obviously, are also distinguishable from this case. And in Gregory- I just wanna ask a question here. Watching the video, it's uncomfortable, to say the least. But we do have to operate under the Qualified Immunity Framework the Supreme Court has established. And just only two years ago, they reversed this 9-0 on an excessive force case, and said, because excessive force is so fact-specific, you really have to have, with a clearly established prong, fact that is very specific to the case that's before us. And here, the one issue I'm struggling with is, Mr. Belanzuela was actively resisting. And if you see the video, they do release him from the hold when they finally secure him. And in the other cases, there is language there. I mean, obviously, there's no video in those cases we could see. In the language, they do refer to the suspect being handcuffed or had surrendered. So, I mean, it doesn't seem clear that there is a clearly established case law here for the second prong. That's the framework we have to operate under. Yes, Judge Lee, thank you. And I would say, first of all, I think it's clear you don't need a case on all fours. And secondly, I think we're going to see a shift in how Qualified Immunity is being handled and has been handled, given some of the comments. But I would say to your question is, as I mentioned, Tamalu Malu was not handcuffed. Bernard, the court said, even if there's some resistance going on and a reasonable interpretation by the officers of resistance, that doesn't justify a carotid restraint. In Gravelay Blondin, a Ninth Circuit 2013 case, it said passive resistance does not justify more than non-trivial force. And I would agree with you, Judge Lee, you do see some resistance in parts of the video. But keep in mind, four seconds from physical contact, they did an air choke on you. And the officers, and they almost had that on for two minutes in the laundry room. And officers are aware and are trained that people have a right to resist unreasonable and excessive force. And that using an air choke's gonna cause someone to panic and resist. That's why, Judge Lee, I tried to really focus for the qualified immunity analysis on that parking lot at the 7-Eleven. Because at that point, Officer June testified at trial and conceded he was restrained, under control, and no threat when the final choke was given. And the other thing I would say, Judge Lee, we have air chokes here. You have to assume air chokes, not carotid restraints. That is equivalent to deadly force. I think even the appellants would agree. And we have a fractured hyoid bone, asphyxia, and manner of death homicide in this case. And the reason is, is because they put pressure to the front of the neck, which should only be used in a deadly force situation. And their training, Judge Lee, is an important factor, as Drummond suggests, and other cases. They knew that carotid restraints were dangerous. They knew if not properly applied. They knew they shouldn't do it for more than 30 seconds or 60 seconds. They shouldn't do it twice within 24 hours. A properly applied carotid, the evidence was, five or 10 seconds, the person goes out. And if that's not working after 10 seconds, you should try something else. So almost four minutes of carotid restraint, air choke hold, under these facts, I would even argue, Judge Lee, this is one of those cases that probably falls within the obvious. But if you take all plaintiff's facts as true, and all reasonable inferences from them, I would say Tamalu Malu, Bernard, Slater, Drummond, and Gravelay-Rondin, clearly established as the court in Tamalu. Tamalu Malu, he was not handcuffed, it was one carotid. So I understand your concern, Judge Lee, and I think it's legitimate given some of the, but I think this case is so clear that this is easy to get around the second prong in qualified immunity. I'd like to also say that I believe there is evidence to support the finding that their policy was unconstitutional. Because specifically that policy allowed for the use of the carotid restraint if someone was only passively resistant. And that's in direct contradiction to Gravelay-Rondin, the 2013 case that said, with passive resistance, you should not use more than non-trivial force. Clearly a carotid restraint is not a non-trivial force. And of course, now the entire state of California, for good reason, has banned chokeholds and the carotid restraint. The other thing on the Bain Act, there's plenty of evidence to support the finding on the Bain Act. As Reese v. County of Sacramento stated, the intent could be shown by a reckless disregard for the person's rights. And there's a difference between the standard of a Bain Act and a 14th Amendment violation with familiar relationship, because it's a very high difficult standard of purpose to harm unrelated to legitimate law enforcement objective. So clearly there was evidence to support the Bain Act and this argument of inconsistent verdict, like many of their arguments, I would suggest has been waived. They claim that they didn't have a chance to talk to the jury or address the court with that inconsistency in the verdict. But this case was bifurcated on liability and damages. They had two or three days in the second phase of the trial while the jury was still there to address that issue if they thought there was any inconsistency. And lastly, I'd like to address this loss of life damages, but before I get there, I wanna see if there's questions from any of your honors regarding anything else. I would like to hear about loss of life. Okay. Thank you. And I must say, this is such an important issue for so many. I can't remember spending this much time in preparation for an appellate argument or being this anxious about it. So I hope I do okay on behalf of all interested parties. The first thing I would suggest is the Robertson case is clearly distinguishable, the Robertson v. Wegman. And that's because as your honors are aware, that was not a case where the violation of federal law caused the death. That was a malicious prosecution case where the person that was litigating it died before it went to trial. And in fact, at the time of his death, he had no heirs. None. And so there was some administrator appointed and that was a Louisiana law. And even the holding of that case indicated this is a very narrow holding. A really well-written decision was the Guyton v. Phillips. And I say that because Chowdhury, which is the controlling precedent in this case, Judge Owens, you were right on the money. Chowdhury specifically says that CCP section 37734 is inconsistent with the policies of section 1983, which are clearly deterrence and compensation. That is the binding precedent of the Ninth Circuit. And it was a very well-reasoned decision. And that decision is so important because it incorporates, first of all, it distinguishes Robertson. Second of all, it cites Guyton v. Phillips. And two things Guyton v. Phillips said that I thought was very telling. The decedent's loss of life, which is the deprivation here, is a compensable injury that survives. That's very important. Two states of the Ninth Circuit, Hawaii and Montana, allow for loss of life damages. States in other parts of the country allow them. The other thing Guyton v. Phillips said, the only just remedy that comes out or that serves the purpose of the Civil Rights Act of 1871 is an award of damages for the actual deprivation of right to life. I mean, the entire Civil Rights Act of 1871, when Congress enacted section 1983, the main reason was to provide deterrence and compensation for the unlawful taking of citizens' life by state officials. In the facts of this case, the jury, even if you take out the loss of life, the jury awarded $9.6 million in damages plus attorney's fees. So you're well into the eight figures. Why isn't that enough to deter cities and police departments and to provide adequate compensation? Well, because Judge Lee, this case is an aberration. As your honors are all aware, very few cases even can get to trial, given the hurdles you have to go through in these cases, including the discussion we had on qualified immunity. Secondly, many of the cases, there are no state claims, because by the time these people come to attorneys, the six months have passed. Thirdly, many times in a death case, Judge Lee, the death is instantaneous. A person is shot in the head. There's virtually no pre-death pain and suffering damage. This case is very unique in that way. So, and that's why the language of several of these cases, including Bell v. City of Milwaukee, the Seventh Circuit case, 1984, that specifically allowed for these damages. It said, if section 1983 did not allow recovery for loss of life, notwithstanding inhospitable state law, deterrence would be further subverted since it would be more admonitions to the unlawful actor to kill rather than injure. And I know that's kind of a perverse comment, but the reality is, if someone is killed instantly by being shot to the head, and there's no loss of life damages, you would have no pre-death pain and suffering, essentially, no loss of life damages, zero damages for a Fourth Amendment violation. And it's very important, Judge Lee, to recognize that unlike the Frontier case from Michigan, you can get wrongful death damages for a Fourth Amendment violation. You can't in California under federal law. If you don't have the state claims, you can't do it. To get wrongful death damages, you have this extremely high burden under the 14th Amendment. And I would suggest the argument that, well, you can get economic damage, that's a deterrent. That's not very persuasive, because many people killed are economically disadvantaged or people of color that have little to no economic means, yet the value of their lives is important. Also punitive damage, that's a higher standard and a different standard and very difficult to get. So yes, and for example, Judge Lee, whatever decision is made here is going to affect all the states in the Ninth Circuit. For example, Nevada, under their state law, the maximum you could recover is $100,000 per claim. So if you did not allow loss of life damages and someone's trying a case in Nevada, they get $100,000, unless they can prove a 14th Amendment violation, which is very difficult to do. So yes, I agree, Judge Lee, if you just looked at this case, you said, wow, there's a lot of damages. But this decision is not just for this case, it's for all cases. And the other thing that I think is very important to recognize, in any case, the trial court and eventually the Court of Appeals is the gatekeeper. If the damages appear excessive for any category, the other side has the right to address that with the court. And the court- Under your view, then, does a Section 1983 claim essentially supersede any state law limits on damages? I would say, Judge Lee, that with respect to the two specific categories we're talking about, pre-death pain and suffering and loss of enjoyment of life, yes. And the reason is, pre-death pain and suffering is the established precedent of this district and loss of life damages, similarly, which Chowdhury relied on the Bellevue City, Milwaukee case. If you did not allow loss of life damages for the unlawful taking of a life, then it would really subvert the entire purpose of Section 1983 and the entire Civil Rights Act. So to answer specifically, those damages need to be- Now, it's gonna be case by case what those damages are or whether people can prove liability. Obviously, you don't even get to damages unless A, you get to trial, and B, you are able to get a unanimous federal jury verdict from good people who are coming and serving on these jurors. So I don't think it's fair to look at the large verdict in this case and say, well, they got enough there, they don't need more, without realizing how it's gonna affect so many other cases and so many other litigants, particularly in a situation where someone's almost instantly killed, the argument would be you have no damages, essentially. And I also think, to all your honors, it's important in looking at chowdhury that they not only reference Bell v. City of Milwaukee and Guyton v. Phillips, but Berry, the Tenth Circuit case, McFadden, the Second Circuit case, so other sister courts held the same. And this is also important, the majority of the district courts, even before chowdhury, were allowing loss of life damages in addition to pre-death pain and suffering. Several of them are cited in the briefs. Post-chowdhury, 2014, there's not one citing of one district court who has not allowed loss of life damages in the verdict form post-chowdhury. They're in every single case. And in this case, defense counsel was very experienced. They try a lot of police cases. The reason they didn't object to the jury instruction or to the loss of life damages being on the verdict form is because they were aware chowdhury was controlling and all the courts were allowing these damages. If these damages were not allowed, I think it would be specifically contrary to chowdhury. And I also would believe it'd be a tremendous step back in trying to have some deterrence, some transparency, and some accountability for the unlawful killings of our citizens. All right, thank you very much, Mr. Gallipoli. We'll go back to Mr. Coates. Well, hold on, Mr. Coates. Hold on one second. You gotta unmute. Happens to everybody. It's okay. Never know if you control it or I control it, so. Go ahead. I'll turn to qualified immunity. And I think it's critical here. The reason why you need a case with similar facts is because plaintiffs are trying to break this into a bunch of units, right? And Mr. Gallipoli, I think wisely, from his tactical move, ran to the very end with the last hole, because it is extremely difficult to say that there is no active resistance through this incident. He keeps saying passive, but these officers are wrestling with this guy. If they weren't wrestling, they would be able to have handcuffed him. They didn't. To the officers, the officers don't get to break this into moments. It is a continuous act. Watch, and you watch that in the video. You're fighting in the laundromat. You're fighting in the parking lot. You're fighting again and wrestling in the 7-Eleven parking lot. That's why the Supreme Court says you need that factual context. And so cases that say, well, generally, when someone is compliant, and I disagree with Mr. Gallipoli on the characterization of whether these people were handcuffed or not in the cases, the court can obviously look and decide for themselves. But you need that entire course of conduct. That's why you need it clearly established within the factual scenario confronted by the officers. This is actually- But counsel, in this case, after the laundromat, the guy's basically running across the street with no pants on. I mean, couldn't the jury have said, look, just let him run around in the parking lot. He's gonna sit down at some point. He's exhausted. You can't approach him as opposed to, you did have a break in this case. You literally had him running across the street with traffic. Why wasn't that enough for a break for the officers to say, you know what? We'll let this guy cool off across the street. He has nothing with him. He has no weapon. Well, then we'll- But of course, that's the ultimate second guess the Supreme Court says you can't do in Grant, right? Because the officers don't have to sit back and say, well, hopefully he'll run across the street. He won't run into anybody. He won't hit a car. He may not attack somebody in the 7-Eleven. They're not required to sit back and try and anticipate whether that is going to happen or not. They had lawful grounds for arrest. He'd already resisted them. They don't have to wait and see what happens at that point. Not even their expert says that. He says they should hold him and have other people come. But even he doesn't say you don't let him run wild. That's not what this case is about. But it is why it's critical for qualified immunity to point to some case law with officers in this ongoing fight scenario where you can say, it's clearly established that you shouldn't even have attempted the chokehold or the carotid artery hold. He keeps calling it an air chokehold, but they're trying to do it as a carotid artery hold. So there's no clearly established law on that. I can turn, I have very little time left, I can turn to Robertson to make a couple of points. Make those points and then wrap it up. Okay. And Robertson talked about, not that they leave open on death cases, but again, California allows recovery of wrongful death damages. That's a distinction with Bell. The Bell problem in the Bell case was the Wisconsin law cut off almost all kinds of wrongful death damages. California does not. That is a major exception. Second, Robertson talks about the great mine run of cases, not about in a particular case, there might not be a recovery under state law. It's the opposite rule. And finally on Chaudhry, I will invoke the age-old appellate proposition, cases are not authority for propositions not addressed therein. The hedonic damages was not at issue in the Chaudhry case. And I think for the reasons stated in Frontier Insurance, they are very different in kind. And I think the fact that the student doesn't actually suffer them and that you basically have no means to measure them, which was emphasized here by some of the arguments in closing. All right, thank you very much, Mr. Coates. Thank you, Your Honor. I'll get to where you're going. Mr. Hou. Yes, thank you, Your Honor. I'd like to address the two other Court of Appeal opinions referenced in Chaudhry. So Mr. Coates just explained Bell. The two other opinions that Mr. Gallipo referenced were Berry and McFadden, but neither of those cases involved loss of life damages. So Berry was about an Oklahoma statute that severely restricted recovery to property loss and lost wages. McFadden was about the availability of punitive damages under New York law. And of course, punitive damages already available under California law. And real quickly, I also wanted to address the point about addressing the quote-unquote actual deprivation of life that Mr. Gallipo referred to. But the question here isn't what is conceptually the best measure of damages if this court or anyone else were to design a remedial scheme from scratch. Congress already decided that state law is the presumptive measure of damages in these cases, and it can be overridden only when it's inconsistent with federal law. All right, right on time. Very well done, Mr. Hou. Thank you all, counsel, for your briefing, your argument, a lot of issues in this case. We appreciate your advocacy. It's always good when we have lawyers who are familiar with the case law and are prepared, and that's what we had in this case. So I really appreciate all of your efforts here. This matter is submitted, and this particular panel with Judge Simon and Judge Lee and myself is adjourned. Have a good day, everybody. Thank you, Your Honor. This court for this session stands adjourned.
judges: Owens, Simon, Lee